Good morning, Your Honors. May it please the Court. Vivian Fu for Petitioner Appellant Hector Aguirre. This is an appeal from the denial of a § 2254 Federal Habeas Petition, which is governed by the AEDPA. Mr. Aguirre was 19 years old at the time of the underlying crimes, which occurred in 2001. He was extradited from Mexico in 2006 after the United States government assured the government of Mexico that if he were extradited to the U.S., quote, neither a sentence of death nor of natural life imprisonment will be sought or imposed in this case, end quote. However, he was sentenced to an indeterminate life sentence of 84 years to life, a clear violation of the specific terms of his extradition. Well, the question is, what does natural life imprisonment mean? And as I read the record, the Superior Court judge acknowledged the existence of Diplomatic Note 504, but found that a mixture of determinate and indeterminate sentences, which, and you'll have to help me with when he's eligible for parole consideration, was not under California law a sentence of life without parole, which is what he interpreted Diplomatic Note 504 to mean. And there is no Supreme Court authority on that issue. So applying the AEDPA, how is that an objectively unreasonable interpretation of the terms of that? Well, I, the two things. First of all, he's not eligible for parole until he's served 84 years of his sentence. Next. He's eligible for parole? After 84 years. After 84 years. Exactly. And he's 26. He was 26 when he was sentenced. About 109. 110, I think. Yes. 10. Yeah. So he'll be there for life. With respect to your second point, it's an unreasonable determination because there's nothing in the record. I would put this under D-2. It's an unreasonable determination of facts. No, it's a legal question, is it not? The question is, what does Diplomatic Note 504 mean when it uses the term natural life imprisonment? That's what the Superior Court was interpreting, was it not? Yes, it was interpreting. But it had no, it was, it made the determination that a natural life imprisonment is equal to life without the possibility of parole. But there's no The Supreme Court has recognized in some of the cases involving juveniles, right? That there is a distinction between life without parole and a life sentence with the possibility of parole. There is a distinction, but I don't think the question, the question, I think the question is more the United States and Mexico had a mutually agreed upon limitation on the sentence. When Mexico agreed to extradite Mr. Aguirre, they did it provided that he would not be subject to a life sentence. Well, that's the ambiguity, is it not? I mean, the question is, what does natural life mean? Does it mean life without parole, or does it mean something else? Well, I think even taking an indeterminate life sentence, even, it's not guaranteed that he will get out on parole. So there's always the potential that he will be, it will be equivalent to life without parole. I think that is your, probably your best argument, because as I review this case, it's unclear what natural life imprisonment really means. And because it is ambiguous or unclear as to the meaning of that, it hasn't been defined by clearly established federal law, it can't be an unreasonable determination to say that natural life is equivalent to life without possibility of parole, right? So you made another argument in your briefing, which is, well, this is a de facto LWOP sentence. And so in some sense, I think that's probably your best argument, or at least it's a better argument than trying to determine that it's a D1 violation, a violation of clearly established federal law. So my question to you is, what Supreme Court case or authority supports your argument that this is considered to be a de facto life without possibility of parole sentence? So that we can say, well, there's that body of law that creates clearly established federal law as determined by the United States Supreme Court, and that this sentence is in violation of that. Oh, I'm sorry, Judge Ferguson. No, no, answer the question. I don't know if there's a Supreme Court case that's on point, saying that a sentence of 84 years is a de facto life sentence. But I think just looking at the fact that someone is not going to survive 210 years in prison, I think that that's, it's on its face, it is a life sentence. But even taking, that's one point. But I think the second point is that any sentence of X number of years to life, a portion of that is a life sentence because you are not guaranteed to get out on parole. I mean, he could be denied parole forever. And that portion of it would be, the portion that is to life is a natural life sentence. Counsel, how do you distinguish... No, go ahead. No, I was, okay. Counsel, how do you distinguish the Supreme Court language... I'm trying to give her a little encouragement, you know. Well, I'm not trying to discourage her. No, no. I'm just trying to get some answers to my question. How do you distinguish the language in Supreme Court cases like Wright v. Van Patten that says, I'm looking specifically at 552 U.S. at 126, because our cases give no clear answer to the question presented, let alone one in the petitioner's favor, it cannot be said that the state court unreasonably applied clearly established federal law, end quote. How do you distinguish that language from this situation where there is no SCOTUS decision directly on point and the superior court is interpreting that term without clear guidance from a Supreme Court case? Well, I think the Supreme Court has said that it doesn't have to, there doesn't have to be a factual situation that is exactly on point. And if the principle, if it's so obvious that there can't, the principles cover the situation, then that is, that should be a basis for federal habeas relief. And I think in this case, a sentence of 84 years to life, you know, for a 26-year-old, I'm not... Your argument is that it is a life sentence, because 84 to life is life imprisonment. The minimum term that you serve is 84 years, right? Yes. Right. The minimum term is 84 years, so that's for a 26-year-old who's, you know, he's not going to get out until he's 110 years old. That is a life, that is a natural life sentence, number one. Even if it was, say, 25 years to life, the to life portion of it is a natural life sentence. What if he'd been 75 when he committed the offense? Would the state be prohibited from sentencing to a term of more than 10 years? I mean, do we look at the actuarial table? That's a little more difficult, and I think that that's not the case here, because that's why this case is so, is more obvious, because it is such an egregious sentence. So you would agree that if the offender was 75 at the time, then a state court could impose a sentence of 25 years, even though that would be a de facto life sentence for a 75-year-old? I think that would be more, I think there's a spectrum, and I think that, you know, if you take a 65-year-old and he's sentenced to 30 years, is that a life sentence? That's a more difficult argument, but I don't think we have that situation here. But I'm trying to, what's the principle of law that you're asking us to apply? Is it based on the age of the offender? Is it based on multiple crimes during the particular offense as opposed to one crime, where there's a possibility of consecutive sentencing? What is the principle that you're asking us to enunciate? Well, I think the principle, at a minimum, is that he should not be sentenced to an indeterminate life sentence. A determinate... So in my hypothetical, the Superior Court couldn't give a 75-year-old a 25-year prison sentence? Well, he could, but he couldn't give a sentence of 25 years to life, I suppose, in your hypothetical. That seems like an absurd resolve. We have a treaty with Mexico? Yes, there's an exception. It's the United States government. Yes. Does the state of California have a treaty with Mexico? The state of California? No. The state of California itself? Yeah. No. No. And so was the Mexican government advised of this sentence of life plus, what was it, 84 years? 84 years to life. Was the government of Mexico advised of this? I don't believe... During trial, trial counsel asked for a continuance so that he could get the Mexican consulate involved, and the trial judge denied him that continuance, so it does not appear as if he was not given time to... So what? Tell me that again. During trial, the trial counsel asked for a continuance in the sentencing so that he could inform the Mexican consulate and get the Mexican consulate involved, and he was denied a continuance, and the trial judge pronounced sentencing without allowing him the chance to get the Mexican consulate involved, so it doesn't appear from the record that the Mexican authorities were notified of this sentence, but it's not entirely... Well, we're required that if we arrest a Mexican national at the border crossing illegally, we now... It's now the law of the circuit, as I understand it, that the consul general of Mexico must be notified of that arrest in case they wish to offer services or help to a citizen of their country, right? Mm-hmm. You know that, don't you? Mm-hmm. Huh? Yes. Yeah, okay. Did the Mexican government ever lodge an objection to the sentence in this case? There was a time when I held that, and I was reversed. I think it was an in-bank reversal. That was many years ago, and now it seems to me that if we're going to... When they talk about natural life sentence, they're talking about, in this situation, a sentence that is going to keep him in prison for the rest of his life. Yes, Your Honor. But to take a 26-year-old person and add 84 years onto it is just clearly unreasonable. Yes, Your Honor. I would agree. And to take a... Now, there was a... You get old. I get old. I got a lot of stories, but one of the stories I heard when I first got on the district court in 67 was they had a very tough judge there named Mathis, and he had a bank robber before him who was 75, and the defendant looked at the judge and he said, Your Honor, I'm 75. You've given me 25 years. I'm never going to make it. And the judge said to him, Well, do the best you can. So, I mean, I thought that was very humorous, but I can't even see you smile when I say that. That's the way it was. Well, I think it would be... And today, if there's a failure to call the Mexican counsel, we reverse, send it back. And this is a much more egregious situation, in my way of thinking. Yes, I... And I'm amazed that the Mexican authorities weren't notified of this sentence. Yes. We got a treaty with Mexico. It's got to be respected. Is there any... And I would think that when it comes to interpreting treaties of the United States, which are part of the most supreme law of the land, that the matter for the federal court to have the final word, not the state court... I agree, Your Honor. Most of these matters handled by the state court are just dealt with by postcards and sort of brushed off by the thousands. Ms. Fu, I take it you have no knowledge as to what the State Department provided the Mexican government in conjunction with the extradition request? Just the diplomatic note 504. You never saw the actual request itself and all the paperwork that goes with it? No, none of that was part of the state court record. Okay. Yeah, so there's just the note. What? The note is clearly from the United States government. Right. Guaranteeing. Have you done any other extradition cases in your practice? No, I have not. There's a lot of material, in my experience, that is provided by the State Department through the United States Department of Justice to the country from which we are requesting extradition, which usually includes copies of all the charging documents, copies of the statutes that establish the statutory penalties for the offenses, but we don't have any of that. Right. One of the issues in this case is that his appellate lawyer refused to raise the... Even though he requested... Mr. Guar requested that he raise the issue that the treaty was violated, his lawyer on direct appeal refused to do that. So that's part of... Who was his lawyer on direct appeal? I'm sorry. I would have to look. It would be in the state court back in 2006. I would have to look up the exact name. But we don't have a Martinez issue that was raised before us, do we? No, there was no... Well, he did raise the ineffective assistance of appellate counsel in the state habeas. I understand, but it's not before us in the federal habeas, is it? It's not currently. Okay. So I don't want to forget my question. All we have in the record, essentially, is diplomatic note 504. And so there's no indication as to what the State Department was aware of, and they never lodged an objection that this sentence is in violation of the treaty or the agreement between the two countries. Right. It appears that they were never told, or the trial counsel, or there were some... It appears that the Mexican authorities and the United States authorities were not told of the sentence, and therefore there was no objection lodged. And then the attorney on appeal refused to raise it. So it was raised on state habeas for the first time, and therefore the record is a little bit... It was raised on habeas for the first time? Yes. And he actually requested evidentiary hearings in state court. But Judge Coleman knows a lot more about this than I do. Right. I know he was on the panel for... He's had the experience as a government lawyer. And did you know about all this paperwork that goes back and forth, and try to look at it and... Well, I... Check it out. It was... I mean, you're from San Diego, right? San Francisco. San Francisco. Yes. So you were the federal defenders in San Francisco? I'm on the CJA panel. The CJA? I'm a CJA appointed attorney. I see. Yes, Your Honor. If... Are there... Have you... Did you think about getting those records and looking at them? Well, yeah, I noticed that there were no... None of those records were there. But the diplomatic note 504 does clearly state that the United States guaranteed that, you know, as a condition of the extradition, that a life sentence and the death penalty would not be imposed. So it's clearly a mutually agreed sentencing limitation just from that piece of paper itself. But the superior court acknowledged, in essence, the doctrine of speciality, did it not? The superior... The superior court judge. Yeah, I mean, he was aware of the existence of the note and saw the language in the note. Did he... I thought there was reference to it. Well, the... I think the trial attorney read it into the record at argument. So this is not a case where the superior court judge said, I'm just blowing off this note because that's an agreement between the United States and Mexico, and I'm a California state judge. I'm not bound by that. That's not what he said. He didn't say that. But he did say that, well, to the extent that you have a problem with it, this isn't the right forum, you can go raise a state habeas petition. So he didn't... But he recognized... He recognized the treaty between the United States and Mexico. Yes, he did. And the question as to what natural life meant, and he said this is not a sentence of life without parole. Yeah, he said, well, it's not life without parole. But he had no basis for saying that. Sure he did. He had Supreme Court cases that recognized the distinction between life without parole and life with the possibility of parole. I mean, he's not on unreasonable ground here, is he? Well, you know, he could make it because we're having all this new biotechnology, and we'll even recreate the brain someday with stem cells. And, you know, people alive today will be around 22nd century. Great advances in science. He could live to be 130. That's what they're saying. He could, but he could still be in jail then because he may be denied. What? But because his sentence goes to life, he could still be in jail. Even if he were to live to be 500 years old, he could still be in jail if he was denied parole the whole time. Well, I'm just being a little facetious. You make that argument about he could be kept alive. They provide proper medical care in prison. But probably not until he's 110. Okay. If there's no more questions. Okay. Good morning, Your Honor. May it please the Court. I'm Kevin Vienna, California Deputy Attorney General, on behalf of Apelli and respondent in this matter. You've been before me before, haven't you? A couple of times, Your Honor. Yeah. You're looking well. I'm not sure it's good to be recognized. He never forgets a face, Mr. Vienna. No, it's your voice. Well, we'll see how this time goes. Yeah. What happened the last time? And you asked me to get some materials to see how he was doing in prison, and I did provide those materials. He was doing sort of okay. That is, he had a history of mental health problems that seemed to be improving. The issue was whether it took the State too long to get him to trial. That was one where he was the lookout during the home invasion? Yes.  That's correct, Your Honor. Oh, that 15-year-old kid. Yeah. Yeah, I remember that. That's right. Yeah, he was there with another boy, wasn't he? And he went around the back of the house. Your memory is? He stole candy, and he took candy out. That's what tied him to the crime. He put the candy in his pocket. That's what tied him to the crime, you know. Took a little candy, didn't really know what was going on. And little mini bottles of liquor, wasn't it? No, no, no, he didn't have any. I don't recall that one. That was another case. Well, I don't recall it, but I don't want to match memories with either of you. His is better than mine. Yeah, no, I remember that well. So where is he now? He's in prison, Your Honor. He was in an inpatient facility, and he'd been doing well with his depression and was expecting to return to general population shortly. He had a bad growing up, too. Yes, he did. You know, let me tell you this quickly, since it's my anniversary. There's a young man, he's about 15 or 16. His family was from Vietnam. And he was with a gang up in San Fernando Valley, and he was driving a car without a license. And there was a member of the gang who was on this passenger seat. There were a couple in the back. Took out a gun when they drove by one corner, pulled a trigger, killed someone. And they were all tried as adults. And this young man, who had no prior record, was sentenced to, I believe it was 20 years in state prison. While he was in state prison, he started taking courses at a local community college. And also, he got his GED. And so he got out of prison when he was about 29 years old. By then, he was well on his way to earning a bachelor's degree. And he went, since he lived in the valley, he enrolled at Pierce College. And went into the animal health tech program. And it turned out, he was one of the brightest students they ever had in school. And he made a full disclosure of his past. And he was admitted at one of the best vet schools in the state. And while he was there, he graduated the top of his class. And he's married now. He's been out for about four or five years. Just an amazing person. But he did spend all that time in prison. So there's another juvenile who was sentenced as an adult. Who knows how many others there are. That's a nice story, isn't it? And it's true. It certainly is. Yeah. I know him personally. He was one of my wife's students. Microbiology. He was the best student she's had in years and years. So there's hope. I want you to feel good. Well, I think you're trying to signal that I might have some hope here. And I'm encouraged by that. Your Honor, the question is, what was the meaning of the diplomatic note, the exchange between the government of the United States and the government of Mexico with the use of the word natural life? And I'm curious to know, Counsel, I don't know how many of these cases you've handled, whether this language of sentence of death nor natural life imprisonment will be sought or imposed, whether it's standard and diplomatic notes for other cases as well, where somebody's being extradited to face murder charges. I've been doing this work for about 14 years. I would say that I've seen extradition from Mexico cases in maybe 15 or 20 cases. I have not seen that language in any other case. It seems at least possible that the use of that language was time sensitive. Earlier, in the early 2000s, Mexico believed that imprisonment for the remainder of life was cruel and unusual punishment. And I've discussed it with extradition experts and DA's offices in Southern California, one of whom worked in the Office of International Affairs at the Department of Justice about that time. And there was a great deal of attention paid to that. The question about, or there was more attention paid to the question of someone who would go to prison and have no possibility under the law for relief or for release. And I don't know that that's how that language got in there, but I don't know that it is recurring and I have not seen it anywhere else. What I do know from some research is that a sentence to imprisonment for the remainder of natural life is a sentence for some states. I found references to it in Arizona law when they had parole and also a case from this circuit involving the state of Washington. California doesn't have a sentence that uses the language imprisonment for natural life. The closest we have, I think as the Superior Court observed and as the California Court of Appeal observed, the closest we have is the imprisonment for life without the possibility of parole. And I believe that's why the Superior Court said that this was not a sentence to life without the possibility of parole. That's what he interpreted, that's what the Court of Appeal interpreted the language to apply to, and that's how they reached their decision. Was that unreasonable? I think the answer to that is no, it's not unreasonable. The argument about whether there's another way to look at it may well be plausible, but the question of whether it's unreasonable for the state to have taken that position doesn't seem to be correct. We certainly have no... We know, that's the first time it's come up. This is the first time that I've seen it. I looked for other cases looking at extradition and natural life. The Aguirre case comes up on Westlaw. There's a case from Washington that's... There was not another case that was on point that is interpreting that language, either published or unpublished in Westlaw. How did they handle it down in Arizona? Well, the case where I found it from Arizona was a case called Little v. Schrierow, 2008, Westlaw, 215-230, Arizona in 2008. It used the language natural life. Unfortunately, it involved an extradition from Michigan, so it provided no assistance to me on what they do or what their practice is in Arizona with regard to natural life. Was the Washington case the one involving the Waumea Massacre where they killed 13 people during a robbery of a Chinese gambling establishment, and then he fled to Canada? I'm not sure of the facts, but the... I can't remember the defendant's name. Bianchi v. Bellingham is the case. Oh, no. No, Bianchi was a different defendant. And that's at 9 on... And I just found these over the weekend. 909 Federal 2nd, 1316, 9th Circuit in 1990, in which this court... And it wasn't reviewing an extradition treaty or the imposition, but what they were looking at was interpretation of application of state law in Washington, and the question came down to whether a sentence of life with the possibility of parole was equivalent to a sentence of natural life, whether those were equivalent under Washington law. And the court in Bianchi said that life with the possibility of parole is not the same as natural life. The case I was thinking of, the defendant's name now I remember, was Quan Willie Mack, and when he was extradited back from Canada, the United States had to agree not to seek the imposition of the death penalty, but it did not prevent the state from sentencing him to life. I didn't come across that, Your Honor, and I'm not familiar with it, but the... But the Mexican government does not employ this type of sentence. I believe that the Supreme Court in around 2005 permitted life in prison, or changed the law in Mexico to permit life sentences, but I don't have a reference to that. There was some brief discussion of it in one of the cases cited in our briefs, United States v. Corona-Verbera, 9th Circuit in 2007, where discussing Mexican law, I think around the time of 2000 or between 2000 and 2005, where the court said that a sentence to life in prison under Mexican law would be seen as cruel and unusual. I believe that's no longer the case, but I don't have a reference for that, Your Honor. We asked Ms. Fu this, and the information isn't in the record, but do you have any information as to whether the Mexican government was subsequently aware of the sentence imposed in this case? Because it sounds like it's a unique language that they gave some thought to in this diplomatic note, and I would speculate maybe somebody would be interested in following up to see what happened in this case. I don't know that anyone did. I find it hard to believe that Mr. Aguirre or his trial defense counsel would not have. Defense counsel made the argument and certainly was aware that he could have supplemented the record for a state habeas corpus procedure if he wanted to do that. What I do know is that unlike Rodriguez-Benitez v. Garcia, this court's case on extradition from Venezuela, Venezuela was actively involved in arguing that the sentence imposed by California violated an extradition treaty, and we have no sense of that, no scent of that in this case. I submit that the state court's interpretation was reasonable because I think the district court applied de novo review and said, according to Magistrate Judge Block, that he concurred with the state's assessment that multiple indeterminate life sentences did not textually violate the language in the diplomatic note of a sentence to natural life. Finally, Ms. Fu, who's argued this case ably, says that, and I believe you mentioned you're not adept to her best argument, that this sentence is tantamount to the sentence of natural life. I think the case that comes closest to that is the one I just mentioned, United States v. Corona-Barbera, and I think they essentially rejected the argument that tantamount to natural life is equivalent to life without parole. Arguments can be made on both sides of this case, but because they can be made reasonably on both sides of this case, I believe under the standard of review that's applicable, this court should deny relief to Mr. Aguirre. Thank you, Your Honor. You're getting very good. I'm trying to learn. You're the number one in your office, as far as I'm concerned. There are some of your fellow judges who disagree. I was pilloried in January and became sort of an Internet star with an argument that I had in a case that didn't go quite so well. Not with you there. No. No, well, what was the name of the case? Johnny Baca. Baca. It had to do with claims of prosecutor misconduct where there was possibly or probably a failure to advise about some involvement with an informant. Oh, yes. We're familiar with that. That was me. That was you. In the public. Have the wounds all healed or do you still have some scarring? Sort of. I run into people in the grocery store once in a while who say they've come across it. And the last I checked, I was over 20,000 hits on YouTube. Thank you, Your Honor. That's good. Thank you. Any rebuttal? I just have one. So with respect to Mexico in 2001, the Mexican Supreme Court did hold that extradition to a country that has life imprisonment is not unconstitutional under the Mexican Constitution. So that was in 2001. But what does that tell us about what they did in 2005? I mean, it sounds like they reversed their position. Yeah, I'm not aware of what happened after. I'm not aware of the case that was to be handled. In either event, there's nothing in the record, right, to support either of your positions on what the Mexican Supreme Court did or did not do. Yes. Okay. So we are extra record at this point. Yes. And I just want to bring up one case, White v. Woodall of the Supreme Court in 2014, just saying that an identical fact pattern is not necessary. And state courts must apply the rules that are squarely established by the Supreme Court. And certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt. And I would just say that this would be one of those cases. Thank you, Your Honor. Thank you. So that is the matter submitted.
judges: Pregerson, Tallman, Nguyen